Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, or rehear the parties or their representatives, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner, with minor modifications.
The Full Commission finds as fact and concludes as a matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission, and the Industrial Commission has jurisdiction of the parties and the subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. At all times relevant to this case, plaintiff was an inmate of the North Carolina Department of Correction.
4. Charles Austin, Byron Horne, Oscar Rouse, Steve Duncan, Sergeant Walker, Michael Sanderson, Joel Hunt and Dr. Davenport were employed by or agents of the North Carolina Department of Correction.
5. On 9 August 1992 plaintiff was confined in the segregation unit at Columbus Correctional Center.
6. The Pre-Trial Agreement between the parties is admitted into evidence as Stipulated Exhibit #1.
7. Columbus Correctional single cell facility roster, dated 9 August 1992, is admitted into evidence as Stipulated Exhibit #2.
8. Plaintiff's incident report, filed 9 August 1992, is admitted into evidence as Stipulated Exhibit #3.
9. Department of Correction Procedures and Policy Manual 5 NCAC 2E -.0201. -.0206 (pages 2 and 3), and department of Correction Procedures and Policy Manual, Custody, 5 NCAC 27 .1301-.1304 are admitted into evidence as Stipulated Exhibit #4.
10. Plaintiff's medicals regarding this claim are admitted into evidence as Stipulated Exhibit #5.
***********
Based upon all of the competent evidence of record, the Full Commission adopts the findings of fact by the Deputy Commissioner with modifications and finds as follows:
 FINDINGS OF FACT
1. On 9 August 1992 plaintiff was a 28-year old male inmate housed in the segregation unit of Columbus Correctional Center. This unit housed twenty-six inmates in individual cells. Inmates were placed in administrative segregation in these cells for various reasons, such as protective custody and close custody.
2. Each individual cell in the segregation unit was just large enough to house a wall-mounted bunk bed and a toilet located approximately two feet from the bed. Each cell had solid walls, except for the front of the cell, which was comprised of bars and a barred door. The segregation unit had two corridors with seven cells lined up on each corridor. Each corridor contained a floor drain.
3. The inmates were served meals in their cells at established times. Lunch was usually served approximately 10:45 a.m. and lasted about 45 minutes.
4. Approximately 12:30 p.m. on 9 August 1992, a drain and the toilets on the corridor side where the plaintiff was housed began to back up. It was later determined that the back-up was caused by torn up bed sheets and T-shirts which had been flushed down one or more toilets by one or more of the inmates on plaintiff's side of the segregation unit.
5. Correctional Officer Sanderson first noticed a 24 x 25 inch puddle of liquid about 12:30 p.m. that had formed around the drain in the floor of the corridor that ran in front of the cells on plaintiff's side of the unit. Officer Sanderson immediately shut off the water and notified Correctional Sergeant Walker as per established department procedure. Officer Sanderson then went through the unit twice and told the inmates to stay on their bunks because they could fall on the slippery, wet floor.
6. The inmate maintenance crew had to be assembled since it was Sunday and they were not together. Inmate Sylvester Smith arrived first and removed the clean-out plug on the outside of the building at the end of the pipe which served the drain and toilets of plaintiff's corridor. This allowed water to drain from the corridor and toilets onto the ground outside of the building. Inmate Smith then returned to the corridor and began to squeegee and mop up the water remaining on the floor of the unit.
7. The rest of the inmate crew arrived to work on the cleanup by 1:00 p.m. As the cleanup progressed, the floors of the individual cells were mopped and a plumber's snake was used to remove the clog from the pipe.
8. The segregated cells and corridor did contain water overflow on the floor. The corridor by the drain had more water than the cells because the corridor had a depression in the floor surrounding the drain and the floors of the cells were sloped slightly downward in the direction of the corridor. By 2:00 p.m. the depth of the water in the corridor was less than three quarters of an inch.
9. The correctional officers had a regular shift change at 2:00 p.m. At that time the cleanup was progressing. Despite Correctional Officer Sanderson's instructions to remain on their bunks, all the inmates, including the plaintiff, were shouting, "Move me out of here."
10. Sometime before 2:47 p.m., plaintiff reported to Correctional Officer Rouse that he had slipped and fallen in his cell after urinating in the toilet. Plaintiff had a cut on the right side of his head.
11. Plaintiff received immediate treatment for his cut and was transferred to the Columbus County Hospital Emergency Room for a scalp laceration and a mild cervical strain. X-rays were negative and plaintiff received sutures for the cut on his head.
12. At the time the plaintiff slipped and fell, he was aware of the slippery and possibly hazardous condition of the floor due to the toilet backup. Although the floor had improved prior to his fall, the floor had been wet since approximately 12:30 p.m. and was still in the process of being cleaned up.
13. The plaintiff did not request any assistance from correctional officers with respect to needing to go to the bathroom.
14. The Department of Correction was not negligent in failing to evacuate the inmates from their cells when the toilet backup occurred. In order to evacuate the inmates they would have had to walk down the corridor through more water than was in the cells. The Department of Correction took the more reasonable and prudent approach in ordering the inmates to stay on their bunks rather than marching them through a more hazardous situation. Although the Department of Correction did evacuate the inmates the next day when one of the inmates set a fire to his mattress, the dangers of smoke inhalation and fire are much greater and necessitate evacuation. An inch or less of water on the floor does not necessitate evacuation.
15. On 11 August 1992 plaintiff complained of neck pain and was treated by the nurse. Plaintiff saw the nurse again on 14 August 1992 and indicated his neck was still sore but his neck range of motion had improved; the right elbow was a new complaint.
16. On 17 August 1992 plaintiff complained of right elbow pain. On 20 August 1992 two sutures were removed from the right side of plaintiff's head.
17. On 24 August 1992 the plaintiff requested through the nurse that he be allowed to see the doctor because plaintiff wanted knee surgery. Plaintiff still complained of neck pain and right elbow pain. There was also a new complaint of a knot on his left shoulder and the Department of Correction sent plaintiff to the emergency room for evaluation. Physical and neurological exams were normal, except for questionable peptic ulcer disease and muscle cramps. Plaintiff was placed on medication and discharged back to the prison.
18. On 26 August 1992 plaintiff was transferred from Columbus Correctional to Moore Correctional. A 27 August 1992 health screening indicates some neck problems, headache and swollen right knee.
19. Dr. Davenport took over plaintiff's medical treatment when plaintiff transferred to Moore Correctional. Dr. Davenport was under contract with the North Carolina Department of Correction to provide medical care to inmates on a regular basis. When Dr. Davenport was not at the prison, the inmates had access to the nurse, who could then determine whether emergency care was necessary or to place the inmate on the list to see the doctor at his next scheduled visit to the prison.
20. On 31 August 1992 plaintiff saw Dr. Davenport for the first time complaining of shoulder pain. A physical exam showed a left trapezius muscle spasm with impression of sprain of the left trapezius. Plaintiff's muscle relaxant/pain killer was changed from Arudis to Roboxin.
21. On 1 September 1992 plaintiff complained to Dr. Davenport that it felt like the circulation in his left arm was cut off. A physical exam revealed no tightness of neck muscles, normal strength in upper extremities, skin warm and dry, good capillary refill of fingers bilaterally indicating no circulatory or neurological abnormality in either arm. The plaintiff also had good grip strength indicating good general neurological output.
22. On 3 September 1992 plaintiff did not show for sick call. On 8 September 1992 the nurse noted plaintiff's face slightly drawn toward the left and plaintiff's complaint was his face, neck and left ear. The nurse referred plaintiff to Dr. Davenport who noted a three-day history of pain in left ear and ear canal. Dr. Davenport's diagnosis was otitis external left, or outer left ear infection. Dr. Davenport prescribed peroxide to irrigate the ear, ear antibiotic drops and oral antibiotic. On 9 September 1992 when plaintiff complained his ear was still bothering him, Dr. Davenport prescribed additional antibiotics. On 14 September 1992 Dr. Davenport followed up on plaintiff's ear and his left ear infection had resolved. On 15 September 1992 plaintiff was a "no-show" for sick call.
23. On 16 September 1992 plaintiff complained of neck and shoulder trouble and needing to go to the dentist. An exam revealed full neck and shoulder range of motion and no swelling; also noted plaintiff's medications and a cracked tooth.
24. Plaintiff saw Dr. Davenport on 21 September 1992 with neck pain. An examination revealed everything normal and a normal x-ray. Plaintiff was continued on pain medications and muscle relaxants. Plaintiff also complained to the nurse on that date of knee pain.
25. Plaintiff complained of sharp pain the night of the 28th and saw the nurse on the 29th. An exam did not reveal any discoloration, spasms or tenderness. The plaintiff was later transferred to Dr. Davenport's office where he complained of trapezius pain. An exam revealed no spasm of the trapezius muscle; Dr. Davenport continued plaintiff on pain relievers and muscle relaxants and indicated for plaintiff to return as needed.
26. On the next recorded visit with the nurse on 13 October 1992, plaintiff complained of neck pain. An exam revealed no spasms, discoloration or limited range of motion. The nurse recommended plaintiff add heat. The plaintiff was a "no show" for the 20 October 1992 sick call; but on 21 October 1992 plaintiff indicated he still had problems with his neck, and needed a laxative and to go to the dentist. The neck exam revealed no changes and the nurse also supplied plaintiff with the requested laxative.
27. Plaintiff was a "no show" for the 26 October 1992 sick call. At the 28 October 1992 visit with Dr. Davenport, plaintiff still complained of problems with his neck. An exam revealed plaintiff's neck was supple without swelling or discoloration. Plaintiff complained to the doctor of his arm "feeling funny" and burning. Dr. Davenport recommended current treatment and re-evaluation.
28. Plaintiff next saw Dr. Davenport on 2 November 1992. At that time a physical exam was negative and negative x-rays were also noted.
29. At plaintiff's 5 November 1992 visit with the nurse, he requested to see the doctor to find out what was wrong with his neck. On that date, as on subsequent visits on 9 November 1992, 13 November 1992, 16 November 1992 and 17 November 1992, plaintiff's physical exam was negative with full range of motion of neck, no discoloration and no spasms. The nurse referred the plaintiff to Dr. Davenport each time the plaintiff requested although the nurses' exam was negative.
30. On 17 November 1992 plaintiff added the complaint of sores in his nose and was given an antibiotic ointment. On plaintiff's next visit on 23 November 1992 plaintiff complained of neck pain and sores on his head. A physical exam revealed no swelling, discoloration or limited range of motion of the neck. One small scab was noted on the hairline of the forehead. On 1 December 1992 plaintiff was seen again for sores, with the scabbed areas on scalp, feet, neck and thigh. Plaintiff was placed on antibiotic cream and referred to Dr. Davenport. Plaintiff complained of itching on 4 December 1992 and was given hydrocortisone cream.
31. Plaintiff again saw Dr. Davenport on 7 December 1992 with his first complaint of rash and second complaint of neck pain. At that time plaintiff was suffering from a bacterial skin infection on his scalp and left foot. Dr. Davenport placed plaintiff on an oral antibiotic, told plaintiff to discontinue scratching and return in two weeks if he was not well. The notes from plaintiff's next follow-up indicate plaintiff had a headache. On 8 December 1992 plaintiff requested the nurse refer him to Dr. Davenport in order to check his neck. The nurse noted no bruising, swelling or muscle spasm. The nurse gave plaintiff Tylenol and referred him to the doctor.
32. On 10 December 1992 plaintiff complained of diarrhea and was placed on medication. On 14 December 1992 Dr. Davenport examined plaintiff and continued the plaintiff on his previous treatment. On 15 December 1992 plaintiff complained of trouble with his neck and feeling sick and tired as well as sores on his head. The plaintiff moved his neck without any difficulty, no swelling, deformity, muscle spasm or discoloration noted. Plaintiff had a normal temperature and blood pressure; his skin was warm and dry, acyanotic. Dr. Davenport continued plaintiff on current medications and recommended plaintiff discontinue scratching sores.
33. On 17 December 1992 plaintiff complained of burning neck pain and requested the nurse make him an appointment with Dr. Davenport. An examination revealed no swelling, discoloration or deformity. The nurse referred plaintiff to Dr. Davenport who treated plaintiff for skin infection and neck pain. Plaintiff had a normal physical neck examination and x-rays were normal. The plaintiff was placed on a different oral antibiotic for his skin infection.
34. On 28 December 1992 plaintiff complained of neck pain and skin bumps. There was no swelling, deformity or discoloration of the neck noted and plaintiff had full range of motion of the neck. Plaintiff also had crusted areas on his scalp and received medication. On 29 December 1992 plaintiff complained of neck pain and rash, but, again, no swelling, discoloration or limited range of motion of the neck was noted.
35. Plaintiff again saw Dr. Davenport on 4 January 1993 where he was continued on the same treatment. At plaintiff's visit to the nurse on 5 January 1993, plaintiff complained of rash and neck problems. An examination revealed no swelling or discoloration and full range of neck motion. Plaintiff also wanted to go to the dentist.
36. On 6 January 1993, plaintiff was a "no-show" for sick call. On 7 January 1993 plaintiff's complaint was a sore in the back of his nose and nausea from an antibiotic. The nurse recommended plaintiff receive food with medication. On 8 January 1993 plaintiff complained that he had not received his snacks with his medication and the nurse notified the kitchen to do so.
37. On 12 January 1993 plaintiff still complained of neck pain and requested Triple Antibiotic for sores. A physical examination revealed no discoloration, swelling or spasm and that plaintiff possessed full range of motion. Plaintiff was given Triple Antibiotic. The next day, 13 January 1993, plaintiff's chief complaint was breakouts on his chest, neck hurting and wanting surgery on his right knee. Plaintiff had arthroscopic surgery on his left knee in 1990 and now claims they operated on the wrong knee. A knee exam reveals no swelling, discoloration, deformity or patellar instability noted. The nurse referenced plaintiff to the doctor for evaluation. Plaintiff also complained of right elbow pain, but an examination revealed no limited range of motion, swelling, discomfort or deformity.
38. On 19 January 1993 plaintiff complained about his neck and sores and requested some analgesic balm and ointment, which he was given. On 20 January 1993 plaintiff was examined for follow-up to the rash and knee pain. An examination revealed two infected scratches in his legs and plaintiff received antibiotics.
39. On 22 January 1993 plaintiff complained his neck was bothering him; he was examined and given Tylenol. Plaintiff also indicated his right elbow was sore, but an examination revealed no objective findings with regard to the elbow, no swelling, discoloration, deformity or limited range of motion. Plaintiff had the same complaints on 27 January 1993 and he was referred to Dr. Davenport. The nurse also referred plaintiff to a psychiatrist at his request due to not sleeping well and dreams of drowning. On 28 January 1993 a red rash was noted on plaintiff's internal thighs and he received hydrocortisone cream.
40. At plaintiff's nurses' visit on 1 February 1993, plaintiff had three complaints: rash, right knee pain and neck pain. An examination revealed a few scattered postules and plaintiff received medication. A knee exam revealed normal patella, but the nurse's plan was an orthopedic appointment. Plaintiff's neck exam was negative with no objective findings. Plaintiff's right elbow was also checked and it was normal. Essentially the same complaints with the same examination results were noted for 4 February 1993.
41. On 5 February 1993 plaintiff complained of a burning sensation in his neck and down his left arm. This was the first time plaintiff complained of left arm pain. An examination revealed no swelling, discoloration or muscle tightness. Plaintiff saw Dr. Davenport on 8 February 1993 with complaints of neck pain and bumps; however, a physical examination was negative, except for postules on the skin. A blood sugar check was performed on plaintiff on 9 February 1993 and he had a normal blood sugar level.
42. Additionally, on 10 February 1993, plaintiff complained of a sore on his back, which upon examination, looked like an insect bite. Plaintiff also complained of neck pain and burning sensation radiating down his left arm. Examination revealed full range of motion of the neck with no swelling, muscle tightness or discoloration. Plaintiff had also recently spoken with a psychologist regarding his dreams.
43. On 12 February 1993 plaintiff's primary complaints were bumps on him and burning feelings in his genitals. Plaintiff declined a physical exam of his genitals and was continued on the current medical therapy. The nurse referred plaintiff to Dr. Davenport for examination. There was a medical note on 15 February 1993 regarding a telephone order from Dr. Davenport to continue with Erythromycin until seen at the next visit.
44. On 18 February 1993 plaintiff went to the nurse complaining of neck pain, arms numb and changing colors. The plaintiff's left hand was cool to the touch with good capillary refill and mildly mottled appearance. Blood pressure in the left arm was 140 over 70 and the right arm 140 over 80; which are normal. After five minutes the color and temperature of plaintiff's arm had returned to normal. Dr. Davenport issued a telephone order on February 19th to keep plaintiff's hand warm and for plaintiff to see him on 22 February 1993.
45. Dr. Davenport started examining plaintiff on 22 February 1993 noting hands and radial pulses were normal. However, plaintiff became so agitated he started shouting and cursing Dr. Davenport. Dr. Davenport had to request officers to remove plaintiff from the nurses' station because plaintiff became so abusive it was impossible to continue to function professionally. Dr. Davenport was not able to complete plaintiff's exam due to plaintiff's behavior.
46. 22 February 1993 was the last time plaintiff saw Dr. Davenport. On 23 February 1993 plaintiff was transferred to Central Prison for right knee arthroscopy, performed 24 February 1993.
47. Plaintiff did not return to Moore Correctional Institution, but following his surgery at Central, plaintiff was transferred to Columbus Correctional Institution on 12 March 1993. Once plaintiff left Moore Correctional, Dr. Davenport could no longer be involved in plaintiff's treatment.
48. When plaintiff's symptoms of left arm discoloration occurred at Columbus with the addition of sweating and causalgias with minimal atrophy, plaintiff was diagnosed with reflex sympathetic dystrophy on 12 April 1993. Plaintiff was referred out for a left stellate ganglion block performed by Dr. Thomas on 2 July 1993.
49. Since plaintiff's diagnosis of reflex sympathetic dystrophy, he has received treatment for this condition and takes medication. Plaintiff has not alleged negligence by any medical provider other than Dr. Davenport.
50. Reflex sympathetic dystrophy syndrome is difficult to diagnose and is rare in males in their late twenties. The syndrome is characterized by diffuse pain in a limb associated with signs of disturbed circulation. Primary symptoms involve discoloration, variation in skin and circulation problems.
51. Plaintiff did not begin exhibiting any of the symptoms of reflex sympathetic dystrophy until his visit with the nurse on 18 February 1993. But even on that date these symptoms had improved and the coloring in his left arm returned to normal within five minutes of being examined by the nurse.
52. At the 22 February 1993 visit with Dr. Davenport, plaintiff's own disruptive conduct prevented Dr. Davenport from fully examining plaintiff.
53. Dr. Creed is plaintiff's current treating physician. Dr. Creed is a general practitioner who is under contract by the Department of Correction to provide medical care to the inmates at Columbus Correctional Institution. Dr. Creed is at the prison one day a week and can be reached by phone or provide office treatment, if deemed necessary by the nurse. Dr. Creed's relationship to Columbus Correctional inmates is analogous to Dr. Davenport's relationship to plaintiff while he was at Moore Correctional.
54. Although Dr. Davenport's notes appear somewhat sketchy at times, this is not unusual in situations where you have repeat exams of the same complaints and the physical exam results in the same findings. Dr. Davenport's notes are within the accepted standard of note taking of a general practitioner in a prison setting. At a prison, the nurse completes the initial examination and refers to the doctor if deemed necessary or upon inmate request. In plaintiff's case at Moore Correctional, the nurse's notes were more detailed than Dr. Davenport's. This conforms to the routine practice of the nurse making the initial examination. Also, the absence of more detailed notes by Dr. Davenport is not necessarily reflective of sub-standard care.
55. Plaintiff relies on Dr. Spanos' opinion with regard to acceptable standards of medical care for the average qualified general practitioner in 1992. However, the Full Commission places greater weight on the testimony and opinions of Dr. Creed and Dr. Bartels because they are general practitioners who serve the prison population. Dr. Creed is familiar with Department of Correction practices and procedures with regard to inmate treatment and Dr. Bartels has run a general family practice since 1981. Additionally, Dr. Spanos is a pain management specialist who treats patients with chronic pain, usually as a last resort and after the patient has been diagnosed. Although Dr. Spanos served in a part-time capacity in an emergency room, there is insufficient testimony as to whether he has actually been involved in following a patient from initial injury through diagnosis, or that he has initially diagnosed a reflex sympathetic dystrophy patient. Dr. Spanos also spends a great deal of time discussing plaintiff's condition after his April 1993 diagnosis of reflex sympathetic dystrophy and his opinion of less than acceptable standard of care seems to be based on this period as well. However, the plaintiff has not alleged negligence by any medical provider other than Dr. Davenport, who last saw plaintiff on 22 February 1993.
56. Dr. Davenport's conservative treatment of plaintiff from August 1992 to February 1993 was entirely consistent with a neck strain, which was plaintiff's original August 1992 diagnosis. It is not unusual to try conservative treatment on sprains for several months absent more serious symptoms which warrant a more aggressive approach. There is no evidence that continued neck pain is an early distinguishing symptom of reflex sympathetic dystrophy. Based on the greater weight of the evidence a delay in diagnosis rarely affects the outcome or course of treatment for reflex sympathetic dystrophy.
57. Dr. Davenport's treatment of plaintiff from August 1992 to February 1993 met the standard of care for physicians in family and general practices in small to medium-sized communities in North Carolina and in Moore County. Dr. Davenport's treatment of plaintiff was appropriate for a general practitioner in a prison and in a rural area. It was conservative and prudent considering plaintiff's nonspecific complaints, normal physical examinations and x-rays.
***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The named employees or agents of the defendant, Austin, Horne, Rouse, Duncan, Walker, Sanderson and Hunt were not negligent.
2. In a medical malpractice claim, plaintiff bears the burden to prove by the greater weight of the evidence, through expert witnesses, that the examining physician failed to meet the standard of care. N.C. Gen. Stat. § 90-21.2.
3. In the present case, plaintiff has failed to prove by the greater weight of the evidence that Dr. Davenport failed to meet the applicable standard of care in his treatment of the plaintiff. Dr. Davenport was not negligent in his treatment of plaintiff.
4. Plaintiff is entitled to no damages from defendant.
***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Under the law, plaintiff's claim is HEREBY DENIED.
2. Each side shall pay its own costs.
This 18th day of August 1999.
 S/_____________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/_____________ J. HOWARD BUNN, Jr. CHAIRMAN
S/_____________ THOMAS J. BOLCH COMMISSIONER